Good morning. My name is David Schlesinger of Guerrero Jacobson Schlesinger appearing on behalf of appellant Eduardo Araza. This appeal presents several issues relating to both Mr. Araza's conviction on two counts of marijuana-related trafficking and his 42-month sentence resulting from that conviction. I would like to begin first by addressing Mr. Araza's Rule 404A issue, then proceed to the 3B1.2b minor role issue, and then time permitting, then move on to the Fifth Amendment voluntariness issue and the 3553A RETA issues that are discussed in the briefs. With regard to Rule 404A, Rule 404A of the Federal Rules of Character Traits, for purpose of proving action or... Well, he talked about his sloppy business records. I mean, when he talked about 404, there's a lot of play in the joints here. I just don't see where that rings the bell. Maybe your other arguments are better. What do you think about that? Well, Your Honor, if I may just briefly respond. In the context of this trial, Mr. Araza's confession or statement was a paramount issue. And to the extent that the prosecutor was commenting on how Mr. Araza kind of does business with regard to his paperwork, his tendency to perhaps run sloppy under the table business, that became very relevant in terms of his dishonesty, perhaps, or whether he was a kind of individual... I can see why you'd argue sloppy, but how on these facts do you argue under the table? What did she say that would suggest under the table? Well, she contrasted, Your Honor, Mr. Araza's business-keeping records with regard to the autos that he purchased. So she said, here, if you're going to... One, he does this one way, and here, he does a different way. But I don't know what you mean when you say under the table. Under the table has some... It's a significant term. You're correct, Your Honor, that she didn't explicitly say under the table. But she did as opposed to his perhaps more sloppy purchasing record-keeping for the cars that he purchased for his business. And so in doing that, as I said, given the paramount nature of the confession in this case, it therefore suggested to the jury, requested the jury infer from that, that he was a dishonest, shady individual who was perhaps inclined to engage in narcotics trafficking or something more or less under the table. Well, let me move on then to my 3B1.2 issue. The district court in this case made three separate findings relating to Mr. Araza's purported, as he claims, his minor role in this offense. That's a problem that I hope you address because this looks like a one-person operation. The only other person is somebody whose name is John Doe. Well, Your Honor, you're correct to say that there is evidence in the record that Juan Perez is the Spanish equivalent of John Doe. However, in Mr. Araza's statement, he stated that he was trafficking on behalf of an individual named Juan Perez. Now, whether that was actually the true name of the individual or not is not relevant because the government had never argued in this case that Mr. Araza was a one-man trafficking operation. And they were certainly happy to submit his confession to the jury and make it a paramount focus of the case for purpose of its case in chief. So given that... Even if there was one other fellow involved, just assuming that... When you look at this court's case regarding 3B1.2, Your Honor, the analysis focuses on whether the defendant is substantially less culpable than other participants. Mr. Araza... What he did here, without a doubt, and it's your argument so you can correct me if I'm wrong, he bought the cars, didn't he? He did purchase the Ford Ranger and the Dodge Commercial. Somebody put narcotics into the car, into the tires. Someone did, Your Honor, yes. And he was driving it. So he had purchased and he certainly was driving it when he was stopped. So the question could be, who put the things in the car? And the question is, who's going to receive it on the other end when he gets to where he's going? But what makes him a minor participant? When he clearly bought the car, he clearly had control of the car as he was driving it with the drugs in it, and the money was going to be paid to him. Wasn't it, on his record? The money from the sale of narcotics was not going to be paid to him. He was going to receive, based on his statement, he was going to receive $1,000. $1,000 for delivering the car. Yes, yes. So that was coming to him. Maybe you can explain this to me also. Certainly, Your Honor. When you talk about comparing in the Ninth Circuit, it's a little different, I think, in the Second Circuit, but I'm here in the Ninth Circuit. Yes. Whether or not the acts of a co-defendant would be less, I guess, culpable than the others, right? But are we comparing apples to bananas? I mean, doesn't that assume that the other co-defendants have to be engaged in the same type of activity? In other words, maybe they also are couriers, and then you measure one courier against the other to see whether or not they're all being treated the same way? Your Honor, if you look at Cantrell and other cases in this court arising out of the 3.1.2 context, you look to the other participants in the conduct at issue, not the average participant in this kind of activity. That's where the Second Circuit, I think, divides with the Ninth Circuit, so I'm just curious about that. So what if you have somebody who is charged with killing 14 people, and then somebody is only charged with attempting to kill one person? That person would get a minor role adjustment by comparison to the killer? No, I think that's distinguishable, Your Honor. As cited in my opening brief and in my reply brief, there is a whole line of cases from the Ninth Circuit specifically dealing with drug courier cases, and the touchstone of that analysis revolves around whether the courier did something more than just merely transiting the drugs. Well, this one did. Well, I would submit, Your Honor, that simply because he purchased a vehicle, the vehicle was going to be used anyway for his automobile import-export business. And as the record clearly reflects in this case, it hadn't actually even been registered to him. So in that regard, it's not different from any other courier case that comes up before this Court. But you have a fellow with Perez, assuming that there's a Perez here. He was not a courier, though, was he? I mean, it seems to me that you're comparing a courier to a non-courier. I don't get it. By comparing the courier to a non-courier, that is an indication that Mr. Arraza was substantially less- Culpable than a person who was not a courier. Culpable than the other person involved in this incident, which is Mr. Perez. And that's how Kentrell and- What do we know about Perez? We don't know whether the individual named Juan Perez is identifiable. And the government, of course, did a subsequent investigation. Didn't specifically find him. But the government in this case never argued that Mr. Arraza was the sole leader organizer of this scene. There's nothing- The record doesn't show what this Juan Perez did. Did he stuff the tires with the marijuana? It's unclear exactly who put the marijuana- Did he orchestrate the whole thing and hire people to stuff the tire, get the truck- I mean, get the vehicle? Right. The record doesn't- Money. Is that what he did? The record doesn't reflect exactly who did what in this- Well, doesn't the defendant have the burden to show that he's entitled to a minor role adjustment? You're correct, Your Honor. The defendant does have- Does he sustain his burden here? Yes, he has, Your Honor. But through his statement, if you take the statement as true, admitting that he transited the narcotics, he admitted that he transited the narcotics on this particular occasion, it shows that he's substantially less culpable than the other person, whether he's Juan Perez or an individual by another name. So the statement itself is more than enough evidence to satisfy his preponderance of the evidence burden in this case. And it would show what? It would show what, just as you conclude? It would show that he had a minor role. It would certainly show that he had a minor role, that he was significantly less culpable than- But is that premised upon the assumption in the Ninth Circle that he has to first be found to be absolutely a courier and not more than just a courier? That's correct, Your Honor. If he is just a garden-variety courier, there is substantial- But if he were to find that he was not a garden-variety courier, then your argument would not hold water, I guess. If it were shown that he had done something to facilitate this conduct in addition to simply just transiting the drugs, then the case law would indicate that he would not have a minor role. But the cases we've cited in our opening brief and reply brief indicate that that kind of additional conduct usually revolves around actually consummating the purchase, owning or leasing a warehouse, actually packaging the drugs. And I should say that in the district court, in speculating that Mr. Rossett actually may have played a role in packaging the drugs, was just basing that on conjecture. And that wouldn't be a basis for withstanding this Court's clear error review. But he had this whole scheme of bringing automobiles in. That's not the typical courier. We see people who swallow drugs and bring them in in suitcases. This seems to be a different type of scheme. There's no evidence, Your Honor, indicating that he was involved in narcotics transiting on any time other than this particular occasion. And so as a result, there's no evidence showing that Mr. Rossett was a director of any kind of massive narcotics undertaking. This was just an isolated incident. And his culpability vis-a-vis Juan Perez or whatever the individual's name is, is substantially less. Moving on then to, unless the Court has any additional questions on this issue, I'll move on to the Fifth Amendment voluntariness issue. Looking under the totality of the circumstances surrounding Mr. Rossett's post-arrest statement, if you apply this Court's case law tingle and his progeny, it seems that Mr. Rossett was subjected to at the very least implicit psychological coercion that led him, given his concern about his 15-year-old son who was on the premises in the detention facility. But tingle doesn't say that. Tingle was a very clear case where the authorities actually said things to the defendant. Here, the confession, it seemed to me, took place before anything was said about his son. All he knew was that his son was being held someplace else, which was a logical type of thing to assume. Well, I would acknowledge, Your Honor, that tingle involved egregious statements made to the defendant in question. But the case does... Well, before the confession. Before the question, yes, Your Honor. But tingle does also talk about how implicit psychological coercion inferred from the circumstances... What did the police, what did the agents do wrong here? I believe what the agents did wrong here, Your Honor, and I've given a great deal of thought to this, is that they should have at the initial, at the outset of the interrogation session, should have clarified Miguel Arraza's role, the role of his 15-year-old son. What does that mean? So they separated him, right? They did... Is there anything wrong with doing that? No, there's nothing wrong with separating... Good, I mean, they should do that, right? Yeah, I'm not suggesting that the agents did anything proper in separating Miguel Arraza. It would be worse if they had his son in the same room with him, I would guess, right? I'm sorry, Your Honor? It would be worse if they had his son with him in the room when they were interrogated. Not necessarily, because at least, Your Honor, he would be assured that his son wasn't being subjected to any improper treatment or... The son was a witness to everything. The son... It was a potential witness. Right. But so, in response to your question, Your Honor, I would suggest that what the government should have done was clarified the role at the outset of the interrogation. And once that was cleared up and Miguel's mother, Mr. Arraza's wife, was then available to pick him up, take him home, secure his safety, and then they could have continued with the interrogation session. But given that Mr. Arraza had already been separated from his son for three hours, given that... Did he ever inquire what they were going to do with his son? He inquired at the very end of the session, Your Honor. At the end, when it was all... After his confession? The evidence as presented at the motion to suppress hearing through Mr. Arraza's testimony corroborated this. It indicated that Mr. Arraza had given an oral statement and then just prior to making a written statement, inquired about his son and what was going to happen to him. And at that point, the agents were glad to make arrangements for Miguel's pickup. So, and given Tingle, given this court's focus on what was termed in Tingle, the primordial sense of the primordial nature of the parent-child relationship, what should have been done was that the nature of Miguel's participation should have been resolved much earlier to mollify Mr. Arraza's concerns about his son's well-being. And therefore, he could have... Could have been resolved before they knew what happened. The father put the boy in the car with him and then the arrest was made and the boy was there. And that's... The father knew why the boy was there. It was because he had him in the car with him. So, I don't know what on this record we can see was coercive. Well, Your Honor, I should point out that the nature of... I'd like to reserve a little bit of time for rebuttal, but I'll just sum up quickly now. At the time Mr. Arraza was giving this statement, his position throughout this case has been that his statement was false. He had no role in this incident whatsoever. And therefore, perhaps it's assuming that Mr. Arraza had some sort of guilty intention with regard to his son being in the car with him. Mr. Arraza's position is that his son was just a passenger in the car on that day as they were proceeding up to L.A. to visit friends and relatives and so on. So, I'd like to reserve the remainder of my time for rebuttal. Thank you. Yes, rebuttal time. I'm Ann Perry from the United States Attorney's Office in San Diego. I was the trial counsel on this case. So, when comments are made as to what the government said, it was generally me. I, unless the panel has specific questions, I will address one of the issues which has been discussed quite at length, which is the issue of role. And there are a lot of issues to be discussed here. One of them is the fact that it has just been raised before you and has been raised in the appellate briefs that he deserves the role because he made a statement saying he was working for this fellow, Juan Perez, who we found out during the course of the trial may or may not really exist. He's a John Doe or whatever. Of interest is the fact that during the course of the trial, of course, Mr. Araza repudiated making any statements at all. He said he didn't have any involvement. He didn't know what was going on. He made up the story about John Doe. So, a statement where the man himself says that I made it all up under oath could not be a basis for the district court to grant a role reduction. In our district, it is common practice, of course, after a conviction to go talk to the probation officer and have the preparation of a pre-sentence report. And as we indicated in our brief, in this case, the defendant declined to make any statements with regard to role or any of the facts of the case. Again, a reason that the district court could not find that the burden had been met. And finally, Judge Subraw also made some rulings on the record regarding, as you're honors have commented on, his involvement in the car business and his involvement with this particular vehicle, which again, would not warrant it. So, it is the position of the government that the role reduction request was not met. Other than that, an issue that has been litigated throughout the course of these proceedings has been the one of these statements made by Mr. Araza, both in the motion to suppress hearing and also at trial. We did submit a 28-J letter to the court. I have additional copies if they are not here. We have it. You have it. Okay. One of the things that was important, I think, is how the record ended up developing on the motion to suppress during trial when Mr. Araza and Miguel Araza took the stand. Because when we first were litigating the motion to suppress, we were kind of in a vacuum. The only thing that we had was Mr. Araza's statement by way of a declaration. And it said something to the effect of agents were saying nasty things to my son. I'm not trying to be flippant, but it was a very generalized statement. It didn't identify any agents. And that was our basis for talking about the suppression at the time of the hearing. As the trial went on, both Mr. Araza and Miguel Araza clarified the fact that they did not talk to one another. They did not see one another. As soon as Mr. Araza was placed under arrest, he was placed in a holding cell. And I think Your Honors have hit the nail on the head here. The reason that Miguel Araza was in a bad way was because his father had put him there. And we have stressed that point throughout these proceedings. This is not like Tingle or any of those cases where the agents, in answer to, I believe it was your question, what did the agents do wrong? It would be the government's position, nothing. They did exactly what they were supposed to do. In fact, at the very end, they gave Mr. Araza a telephone, had him call his wife, and pick up Miguel to take him home. Unless the panel has any further questions, I would submit. Is there any issue here about the sentence being imposed within the guideline range in light of the pending cases before the Supreme Court and this Court as to whether or not there's a presumption of reasonableness that can attach to a guideline sentence? I think not, Your Honor. I've actually argued this exact same issue because of this exact same judge. And so I was examining the record very carefully in light of the previous case that I had. In this case, Judge Subraw actually made specific comments about the 3553A factors. Let me ask you this. If the record was to reflect that the district court judge did say that I presume, or I start off with an advisory guideline sentence, and I presume it's reasonable, and then I will, you know, consider also the 3553A factors, is there any problem with doing that? As the law stands now, I think not. But he didn't do that. It's uncertain, though, isn't it? Isn't it a little unclear whether you can engage in a presumption of reasonableness as a district court judge? I agree, but I don't think he did in this case. Well, but that – but what if we were to disagree? I mean, I think the record perhaps could be read to say that the judge did adopt the advisory guideline range and believe that that was a reasonable thing to do, and then went on to consider a couple of 3553A factors. What I recall, both from being there, from reviewing the transcript last night, is that he went through the guidelines analysis, which, by the way, very much worked in favor to Mr. Arraza because he got a bunch of concessions that I certainly argued against. And he then said, these are the guidelines and this is the guideline sentence. I am now looking to see if it's a reasonable sentence under the factors enumerated in 3553A. The concept of reasonableness that was associated with the guideline advisory calculation, correct? Right. That's what I was concerned about because it seems to me in making that comment that the judge didn't, at that time, just interjected the concept of reasonableness in the context of the advisory guideline calculation. I don't think so, Your Honor, only because he then proceeded to bring up specific and general matters under 3553A. But the court did that only after saying that, you know, that the advisory guideline range was reasonable. I think that, given the Rita case, that this court can hold that the judge's determinations were proper. Well, you know, all this is going to be settled pretty soon because we have the Supreme Court's decision in Gaul and we have pending in Gaul and we have our own en banc decisions in Zavala, Cardi Zavala, that are waiting for Gaul. So all this is going to come to some fruition, I'm confident, in not too distant future. I hope so. I argued this back in February on the same issue. I know. Well, I had a hand in the Zavala opinion, so. If there's nothing further, thank you very much. Thank you for your argument. Do you have any rebuttal? Yes, Your Honor. You have a few minutes. She didn't really say too much, though. I'm going to try not to, Your Honor. I'll keep it brief and to the point. She said as much as she needed to say. Yeah. Let me seize first on Judge Block's concerns about what the district court did regarding the guidelines range here. I'll turn to ER 277 to give you exact words. He calculated the guideline range and then asked, quote, and said, quote, and the question is whether a sentence within that range is reasonable and appropriate under 3553A. So I think there is something to what you're saying, Judge Block, in that he is enhancing analysis to the guidelines range to see whether anything could shake him from it. Yeah. It's going to be that way, too, but we're going to have to wait to see how all these cases shake out. And that's correct, Your Honor. And I would be glad, should the court deem it advisable, to submit supplemental briefing after Zavala and Cardi and any other Supreme Court cases. I think there's one pending right now dealing with guidelines issues. So I would be glad to submit supplemental briefing if the panel finds that to be advisable. Let me quickly get back to the minor role for just one point. Ms. Perry, of course, talked about how Mr. Arraza's- Who else was arrested in this scheme of things, other than your client? As far as the record reflects, Your Honor, Mr. Arraza was the only person who was arrested. I don't know- So when we say minor, who are we comparing him to in terms of the arrestees who were convicted or- Right. We're comparing him to the only other potential participant in this case, that the man referred to as Juan Perez. The case law- The only other alleged participant, because at this point, that's what he is, isn't he? You're correct that he is only an alleged participant, Your Honor. But the government's theory in this case was that Mr. Arraza was not an organizer leader. He was just a courier. Let me get to Ms. Perry's point about Mr. Arraza's statement about his minor role. There's nothing in this court's case law that precludes an individual from exercising his constitutional right to a jury trial, going to trial, and then thereafter, after trial, seeking a minor role adjustment. As a matter of fact, we cite three cases in our opening brief. Louie, Hoak, and Davis for the proposition, which in those cases, the individual sought a minor role after trial. This court didn't explicitly preclude- Did you find any case anywhere at any time where we talked to when the only person arrested in a crime was given a minor role? I did not find a case, Your Honor. There was one case cited in the brief, the Louie case, in which the individual went to trial, did not give a statement at trial. The government, he basically bases defense on a pure reasonable doubt theory. He was convicted of having engaged in couriering of 12 kilos of heroin. And after trial, sought a minor role adjustment. This court said, well, he's not entitled to it because he basically doesn't have any evidence other than a self-serving statement. Here, this is beyond just a self-serving statement for Ms. Arraza. It was a central focus of the government's case in chief. In a sense, the government's trying to have it both ways by taking Mr. Arraza's statement, saying that this is his account of the facts, and then saying he can't get it for a minor role adjustment. So there's kind of a double dealing here in a sense that I'm concerned about. And I think that the case law would support a minor role adjustment. You know, you're young and you're going to have a long career. What's the double dealing in this case? Well, I'm not suggesting there was anything duplicitous, Your Honor. I'm suggesting, if I may finish my- Finish your comment. Thank you, Your Honor. I'm just suggesting that the government is trying to use the statement for different purposes, and that the case law doesn't support it. They're using the statement to prove at trial that he's guilty beyond a reasonable doubt. Doesn't timing have something to do with it? I'm sorry, Your Honor. He made the statement, then he went to trial. Isn't that what happened? He did make the statement. He did go to trial. No, but what was the sequence? I'm sorry, Your Honor. The statement was made first, wasn't it? That's correct. He made the statement- Then he went to trial. He did go to trial. That's what I don't quite follow what you're saying, that the government's doing something wrong here. I'm not suggesting that they're doing something wrong. I'm just suggesting that the case law allows Mr. Arraza to go to trial, say that the statement was false, and then thereafter, accepting the jury's verdict, still use it to prove it by preponderance of the evidence that he's entitled to minor role adjustment. I follow you. All right. Thank you, counsel. We appreciate your arguments. The matter will be submitted.
judges: Farris, Paez, Block